UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                          :
NATURAL RESOURCES DEFENSE COUNCIL,                        :
                                                          :
                          Plaintiff,                      :        17-CV-5928 (JMF)
                                                          :
            -v-                                           :        OPINION AND ORDER
                                                          :
U.S. ENVIRONMENTAL PROTECTION AGENCY,                    :
                                                          :
                          Defendant.                      :
                                                          :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Plaintiff Natural Resources Defense Council (the "NRDC") sues the United States

Environmental Protection Agency (the "EPA" or the "agency") under the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552, seeking certain documents and records that the EPA

has withheld pursuant to one of FOIA's enumerated "exemptions" — specifically, records

concerning a senior manager's participation in certain agency policymaking activities. The EPA

now moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment.

For the reasons that follow, the Court grants the motion in part and denies it in part, orders the

production of certain records, and directs the parties to confer on next steps.

## BACKGROUND

The relevant facts are drawn from the parties' affidavits and are undisputed for purposes

of this motion. The NRDC is a "national, not-for-profit environmental and public health

membership organization" that "engages in research, advocacy, public education, and litigation

related to protecting the environment and public health," including efforts to "eliminate health

risks posed by exposure to toxic chemicals." ECF No. 41 ("Tallman Decl."), ¶ 2. The EPA is a

federal agency charged with, among other things, regulating the use of commercial chemicals and pesticides. *See* ECF No. 36 ("Myrick Decl."), ¶¶ 24-31. Within the EPA, the Office of Chemical Safety and Pollution Prevention ("OCSPP") is specifically tasked with "protect[ing] human health and the environment from potential risks from pesticides and toxic chemicals." *Id.* ¶ 9. In 2017, Dr. Nancy Beck joined the EPA as the Deputy Assistant Administrator of OCSPP. *Id.* ¶ 13. Prior to that, she had been the "Senior Director of Regulatory Science Policy" at the American Chemistry Council, a group that "represents companies that are directly regulated by EPA." ECF No. 36-12, at 9. In her new role, Dr. Beck would participate in policymaking processes — for example, implementing the amended TSCA — that would directly affect industry participants she had previously represented. *Id.* at 10-11, 14.

In May 2017, the NRDC submitted a FOIA request to the EPA, seeking records relating to Dr. Beck's participation in agency rulemaking and other policy-making activities under the amended Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601 *et seq.*[1] On August 4, 2017, the NRDC filed suit for those records. Myrick Decl. ¶¶ 6, 11; *see also* 5 U.S.C. § 552(a)(4)(B). In November 2017, the parties agreed upon a scope for the agency's records search. Myrick Decl. ¶ 12; ECF No. 19, at 1-2. Specifically, the EPA agreed to search for records relating to Dr. Beck's participation in the following seven policymaking domains:

1. The TSCA "Framework Rules." As amended in 2016, the TSCA required the EPA to complete two rulemakings — namely, rules relating to "Procedures for Prioritization of Chemicals for Risk Assessments under the TSCA" and "Procedures for Chemical Risk Evaluations under the amended TSCA," Myrick Decl. ¶ 24 — within one year of the amendments, or June 22, 2017.

---

[1]    NRDC also sought "ethics related documents" relating to Dr. Beck, her hiring, and her potential conflicts of interest. *See, e.g.*, Myrick Decl. ¶¶ 6, 17-19. Those records are no longer at issue, however, and thus are not addressed here. *Compare* ECF No. 40 ("NRDC Mem."), at 22-23, *with* ECF No. 49 ("NRDC Surreply"), at 5 n.1.

2. Implementation of the "New Chemicals" program, including potential improvements to the program and elimination of a backlog of chemical review submissions filed by companies.

3. Rulemakings under TSCA Section 6(a) on the use of three chemicals: trichloroethylene, methylene chloride, and N-methylpyrrolidone.

4. Pesticide actions relating to the pesticides chlorpyrifos and glyphosate.

5. The development of "scope" for the first ten chemicals to be evaluated under the amended TSCA.

6. Potential changes to the "Chemical Data Reporting" rule under TSCA Section 8(a).

7. Evaluation of existing EPA regulations.

Myrick Decl. ¶¶ 12-13, 24-31. The agency also agreed to a timeline for reviewing the records and producing those which it determined were not "exempt" under FOIA. *Id.* ¶ 15; *see* 5 U.S.C. § 552(b) (listing the categories of records that need not be disclosed by an agency).

Following its search and review, the EPA identified 1,350 responsive records. Of those records, it has released 277 in full; released in part and withheld in part 920 records; and withheld in full 153 records. *Id.* ¶ 16. For the records withheld in whole or in part, the agency claims they need not be disclosed pursuant to either or both so-called Exemption 5 (which incorporates civil discovery privileges such as the deliberative process and attorney-client privileges) and Exemption 6 (which protects private personal information). *See* Myrick Decl. ¶¶ 22-23, 36-37; 5 U.S.C. § 552(b)(5), (b)(6). To evaluate the EPA's exemption claims, the NRDC selected a set of 120 records (reduced to 116 following additional disclosures by the agency) for which the EPA would provide a "*Vaughn* index" — a document that describes non-disclosed records in enough detail for a requester (and, often, a reviewing court) to assess the validity of an agency's assertions that the withheld records are actually exempt from disclosure under the statute. *See* Tallman Decl. ¶ 16; *see also Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973); *ACLU v. United States Dep't of Justice*, 844 F.3d 126, 129 n.4 (2d Cir. 2016).

The EPA now moves for summary judgment on the NRDC's claims, contending that its *Vaughn* index and affidavits establish that it properly withheld the challenged documents under Exemptions 5 and 6. The NRDC does not challenge the EPA's Exemption 6 claims. *See* NRDC Mem. 6. Instead, it contends that the agency has failed to demonstrate that: (1) it conducted an adequate search for responsive records; (2) its withholdings are justified under Exemption 5; (3) it disclosed all reasonably segregable, non-privileged factual information, as required by FOIA; and (4) it sufficiently articulated the reasonably foreseeable harms that disclosure would cause to the agency's exemption-related interests. The parties also disagree about whether documents beyond the 116 at issue here remain in dispute: The EPA contends that by selecting 120 records, the NRDC waived or abandoned its claims regarding the other approximately 950 records withheld in full or in part, an argument to which the NRDC strenuously objects.

Based on an initial review, the Court ordered the EPA to submit a sample of ten records *in camera* to assess its claim that it had disclosed all reasonably segregable, non-exempt information. It further ordered the agency to submit a supplemental affidavit or *Vaughn* index explaining with more specificity what harms to exemption-related interests the disclosure of the challenged records would cause. *See* ECF No. 53. The EPA did both.

## LEGAL STANDARDS

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). To effectuate this purpose, FOIA mandates disclosure of agency records unless those records fall within certain enumerated exceptions, which "are to be interpreted narrowly in the face of the overriding legislative intention to make records public." *Tigue v. U.S. Dep't of Justice*, 312 F.3d

70, 76 (2d Cir. 2002).  Exemption 5 — the only exemption still at issue in this case — protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C § 552(b)(5).  "By this language, Congress intended to incorporate into the FOIA all the normal civil discovery privileges," including the attorney-client and deliberative process privileges.  *Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991).  To be protected by the deliberative process privilege, "a document must be both 'predecisional' and 'deliberative.'" *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999).

The exemptions notwithstanding, an agency must produce any non-exempt portions of a record that are "reasonably segregable" from portions that are exempt.  5 U.S.C. § 552(b).  Additionally, "purely factual" material is generally not exempt from disclosure.  *See Grand Cent. P'ship*, 166 F.3d at 482.  Further, following amendments to the statute in 2016, "[a]n agency shall withhold information under [FOIA] only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b)."  5 U.S.C. § 552(a)(8)(A)(i) (roman numerals and dashes omitted).  As discussed in detail later, this provision imposes an independent and meaningful requirement on agencies before they may withhold a record under one of FOIA's exemptions.  *See Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019) ("[E]ven if an exemption applies, an agency must release the document unless doing so would reasonably harm an exemption-protected interest."); *accord Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 72, 78 (D.D.C. 2018).

Summary judgment is the procedural vehicle by which most FOIA actions are resolved.  *See, e.g.*, *Grand Cent. P'ship*, 166 F.3d at 478.  "In resolving summary judgment motions in a FOIA case, a district court proceeds primarily by affidavits in lieu of other documentary or

testimonial evidence." *Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012). As the

Second Circuit has explained:

> Summary judgment is warranted on the basis of agency affidavits when the
> affidavits describe the justifications for nondisclosure with reasonably specific
> detail, demonstrate that the information withheld logically falls within the claimed
> exemption, and are not controverted by either contrary evidence in the record nor
> by evidence of agency bad faith.

*Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009) (quoting *Larson v. Dep't of State*,

565 F.3d 857, 862 (D.C. Cir. 2009)); *accord Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812

(2d Cir. 1994) ("Affidavits or declarations supplying facts indicating that the agency has

conducted a thorough search and giving reasonably detailed explanations why any withheld

documents fall within an exemption are sufficient to sustain the agency's burden."). Although

the agency's determination that requested information falls within a FOIA exemption is reviewed

*de novo*, *see* 5 U.S.C. § 552(a)(4)(B); *Department of Air Force v. Rose*, 425 U. S. 352, 379

(1976), the affidavits submitted by the agency in support of its determination "are accorded a

presumption of good faith," *Carney*, 19 F.3d at 812 (internal quotation marks omitted).

Ultimately, "the agency's justification is sufficient if it appears logical and plausible." *ACLU v.

U.S. Dep't of Def.*, 901 F.3d 125, 133-34 & n.9 (2d Cir. 2018), *as amended* (Aug. 22, 2018)

(emphasizing that the agency's claim of privilege must be "logical *and* plausible"); *accord

Wilner*, 592 F.3d at 73.

## DISCUSSION

The NRDC raises a handful of challenges to the EPA's motion: to the adequacy of the

agency's search for the records sought; its showing of reasonably foreseeable harms to its

deliberative process-related interests; its claims that Exemption 5 applies to the challenged

records; and to its claims that it released all reasonably segregable non-exempt material. The

Court addresses each in turn, spilling the most ink on whether Exemption 5 applies.

**A.  The Adequacy of the EPA's Search for Responsive Records**

In a FOIA case, "the defending agency has the burden of showing that its search was adequate." *Carney*, 19 F.3d at 812.  On this score, "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search . . . are sufficient to sustain the agency's burden." *Id.*; *see also Grand Cent. P'ship*, 166 F.3d at 489.  Under this standard, a "good faith effort to search for the requested documents, using methods reasonably calculated to produce documents responsive to the FOIA request" will suffice. *Adamowicz v. IRS*, 672 F. Supp. 2d 454, 461-62 (S.D.N.Y. 2009) (internal quotation marks and citations omitted), *aff'd*, 402 F. App'x 648 (2d Cir. 2010).  Importantly, "[t]his standard does not demand perfection, and thus failure to return all responsive documents is not necessarily inconsistent with reasonableness: an agency is not expected to take extraordinary measures to find the requested records, but only to conduct a search reasonably designed to identify and locate responsive documents." *Id.* (internal quotation marks omitted).

Applying those standards here, the Court concludes that the EPA has carried its burden of showing that its search was adequate.  The NRDC's sole argument to the contrary is that the EPA's search terms were "too restrictive" — namely, they "omit[ted] numerous key search terms [by] excluding common plain language or short-hand versions of many words, as well as commonly-used trade names for chemicals." NRDC Mem. 23-24.  For example, the search terms did not include "RoundUp" (which includes glyphosate, with respect to which the NRDC seeks records); did not use abbreviations for the EPA's Risk Evaluation rule such as "Risk Eval" or "RE"; and did not include commonly used abbreviations like "PMN" (for "premanufacture notice," which EPA did search for). *Id.*; *see also* Myrick Decl. ¶ 13.  But "[f]ederal agencies have discretion to craft the search terms that they believe to be reasonably tailored to uncover

documents responsive to a FOIA request," *Brennan Ctr. for Justice at New York Univ. Sch. of Law v. U.S. Dep't of Justice*, 377 F. Supp. 3d 428, 434 (S.D.N.Y. 2019), and, in general, "a FOIA petitioner cannot dictate the search terms for his or her FOIA request," *Bigwood v. United States Dep't of Def.*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015). Here, the EPA developed a reasonably broad set of search terms in consultation with subject matter experts in Dr. Beck's office and the EPA's Office of General Counsel. *See* Myrick Decl. ¶ 13. And, as the agency explains, many of the acronyms and search terms proposed by the NRDC would have pulled in a wide swath of records unrelated to its request for records or swept up every single email sent or received by Dr. Beck. *See, e.g.*, ECF No. 47, ¶ 4 (noting that "RE" and "MC," which the NRDC proposed, are ubiquitous in email headers and EPA signature blocks). Nor is the agency mandated to search every variant or alternative name for a chemical or program, as the NRDC's long list of proposed additional search terms suggests. *See* ECF No. 41, at ¶ 14. (And, in any event, the agency did search for several variants of most search terms.) Accordingly, the agency's choice of search terms was reasonable and "reasonably calculated to produce documents responsive to the . . . request." *Adamowicz*, 672 F. Supp. 2d at 461-62. The NRDC raises no other objections to the search, which, judging by the agency's affidavits, was more than adequate. *See* Myrick Decl. ¶¶ 13-14.

## B. Reasonably Foreseeable Harms to Disclosure-Related Interests

As noted, FOIA now provides that "[a]n agency shall . . . withhold information under this section only if . . . the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b)." 5 U.S.C. § 552(a)(8)(A)(i). In an earlier order, the Court concluded that this provision "impose[s] an independent and meaningful burden on agencies" and that, "to satisfy the 'foreseeable harm' standard, an agency must explain how a

particular Exemption 5 withholding would harm the agency's deliberative process." ECF No. 53, at 1-2 (internal quotation marks omitted) (quoting *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018)). Finding that the EPA's "generic, across-the-board articulations of harm" were insufficient to make this showing, the Court ordered the agency to file supplemental affidavits to describe with greater particularity the Exemption 5-related interests that would be harmed by disclosure. ECF No. 53, at 2.

Assessing the agency's showing requires an examination of the interests served by Exemption 5 and the privilege in question. The deliberative process privilege is

> designed to safeguard and promote agency decisionmaking processes in at least three ways: It serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Grand Cent. P'ship*, 166 F.3d at 481 (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). More simply, the "efficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to operate in a fishbowl." *EPA v. Mink*, 410 U.S. 73, 87 (1973) (internal quotation marks omitted).

The EPA's supplemental affidavit generally identifies three interests related to the deliberative process that, unsurprisingly, hew closely to the interests articulated in *Grand Central Partnership*. *See, e.g.*, ECF No. 56 ("Second Supp. Myrick Decl."), ¶¶ 15-17 (listing those three rationales with respect to pesticide reviews). Those interests are the same as the ones originally identified by the agency, *see* Myrick Decl. ¶ 35, and which the Court found to be inadequately articulated. In its supplemental affidavit, however, the agency has provided substantially more

context for the decisionmaking processes in question and the harms that would reasonably ensue from disclosure of the material — which makes all the difference.

First, the EPA explains in some detail how disclosure of records relating to the Section 6(a) rulemakings, the pesticide registration reviews, the Chemical Data Reporting rules, and the evaluation of existing regulations could prematurely disclose agency rulemakings or policies that have not been finalized. *See* Second Supp. Myrick Decl. ¶¶ 13, 15 22, 25; *id.* ¶¶ 14-15 (relating that OCSPP is "currently engaged in the registration review for glyphosate and chlorpyrifos" and that disclosure of records relating to this "ongoing" review could prematurely reveal the agency's decision on these reviews or rationales underlying possible decisions). Preventing such disclosures is a core aim of the privilege. *See Grand Cent. P'ship*, 166 F.3d at 481. Second, the affidavit lays out, for example, that Dr. Beck exchanged emails and working drafts of scope documents with OSCPP staff and EPA attorneys and that those records contain "unvetted, incomplete and subjective opinions and rationales of [the staff] who shared the information with Dr. Beck for internal discussion." Second Supp. Myrick Decl. ¶ 20. Disclosure of those rationales and opinions could risk "confusing the issues and misleading the public." *Grand Cent. P'ship*, 166 F.3d at 481; *see also, e.g.*, *Fox News Network, LLC v. U.S. Dep't of The Treasury* ("*Fox News I*"), 739 F. Supp. 2d 515, 541 (S.D.N.Y. 2010) ("[D]isclosure of the various drafts . . . would reveal . . . alternatives that were not adopted and discussions regarding the rationale for provisions that were adopted which may not accurately reflect the ultimate rationale for their adoption."). Finally, the agency describes how staff members' "[c]andid, even blunt, staff considerations and assessments" of programs like New Chemicals are important to improving the agency's processes and that disclosure of frank opinions about "existing approaches" and ways to improve could discourage such candor in the future. Second Supp. Myrick Decl. ¶ 8. While

some of the EPA's discussion still verges on boilerplate, the Court finds overall that the agency has adequately articulated "the link between this harm and the specific information contained in the material withheld." *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 101 (D.D.C. 2019). In short, because the agency has demonstrated a logical relationship between the specific decisionmaking processes involved and the harms that the privilege guards against, it has shown that it "reasonably fores[aw] that disclosure would harm" its Exemption 5-related interests. 5 U.S.C. § 552(a)(8)(A)(i). It follows that summary judgment must be and is granted to the agency on this issue.

## C. Information Withheld Under the Deliberative Process Privilege

Next, the Court turns to the most substantial issue in dispute: the applicability of the deliberative process privilege by way of Exemption 5. The EPA withheld the lion's share of the records at issue on that basis. After laying out the relevant legal principles, the Court assesses the adequacy of the agency's claims of exemption, grouping the records by rough category. Some categories pertain to the *type* of document (e.g., drafts of agency rules, "messaging" documents, "briefing" documents); others relate to the substantive subject matter of the records (e.g., records relating to the agency's "New Chemicals" program).

### 1. Applicable Legal Principles

The deliberative process privilege is designed to protect the "process by which governmental decisions and policies are formulated." *Tigue*, 312 F.3d at 76 (internal quotation marks omitted). It does so "by preserving and encouraging candid discussion between officials." *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005). Under the privilege, the Government may withhold "an inter- or intra-agency document . . . if it is: (1) predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision,

and (2) deliberative, *i.e.*, actually related to the process by which policies are formulated." *Id.*

(alterations and internal quotations marks omitted). "[W]hile the agency need not show *ex post*

that a decision was made" based on the document, "it must be able to demonstrate that, *ex ante*,

the document for which [the] privilege is claimed related to a specific decision facing the

agency." *Tigue*, 312 F.3d at 80. Considerations informing whether a record is "deliberative"

include "whether the document (i) formed an essential link in a specified consultative process,

(ii) reflects the personal opinions of the writer rather than the policy of the agency," and "(iii) if

released, would inaccurately reflect or prematurely disclose the views of the agency." *Grant*

*Cent. P'ship*, 166 F.3d at 482 (internal quotation marks and alterations omitted). Accordingly,

the privilege "focus[es] on documents 'reflecting advisory opinions, recommendations and

deliberations comprising part of a process by which governmental decisions and policies are

formulated.'" *Hopkins*, 929 F.2d at 84-85 (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S.

132, 150 (1975)). It generally does not cover "purely factual" material. *Grand Cent. P'ship*, 166

F.3d at 482. Nor does it cover records that are "merely peripheral to actual policy formation; the

record[s] must bear on the formulation or exercise of policy-oriented judgment." *Id.*

 Finally, in assessing a claim of deliberative process privilege, it is important "to

understand 'the function of the documents in issue in the context of the administrative process

which generated them.'" *Lead Indus. Ass'n, Inc. v. OSHA*, 610 F.2d 70, 80 (2d Cir. 1979)

(Friendly, J.) (quoting *Sears, Roebuck & Co.*, 421 U.S. at 138). Ultimately, "[w]hether a

particular document is exempt under [Exemption 5] depends not only on the intrinsic character

of the document itself, but also on the role it played in the administrative process." *Id.*

## 2. Drafts of Agency Rules, Formal Guidance, and Scoping Documents

A large fraction of the records at issue are draft rules or agency guidance, or documents integral to the rulemaking and guidance drafting processes. For example, the records include "a 63-page working draft of the preamble portion to [a] draft final rule," which was later published in the Federal Register; a "draft response to public comments received" regarding the EPA's proposed "prioritization rule," also published later in final form; and a "draft flowchart" that laid out "options for EPA's consideration as part of developing . . . [a] rulemaking" on chemical data reporting. *See Vaughn* Index I, ECF No. 36-1 ("VI"), at 87-89, 107-08; *see also, e.g.*, *id.* at 109 (working draft of a formal agency guidance document later published in the Federal Register).

These records were properly withheld. "Internal deliberation on a final agency rule clearly falls within the traditional scope of the deliberative process privilege." *Fox News I*, 739 F. Supp. 2d at 549 (collecting cases); *see also, e.g.*, *Lead Indus. Ass'n*, 610 F.2d at 86 (affirming the agency's withholding of "drafts of the preamble to . . . standards that appeared in the Federal Register"); *NRDC v. Fox*, No. 94-CV-8424 (PKL) (HBP), 1998 WL 158671, at *4 (S.D.N.Y. Apr. 6, 1998) ("Drafts of final agency decisions . . . have consistently been held to be within the deliberative process privilege."). That principle encompasses not only drafts of the rule or regulation in question, but also "any communications regarding [the] drafting and revision" of the rule. *Fox News I*, 739 F. Supp. 2d at 549. After all, such documents are plainly predecisional with respect to the rule being crafted and, almost by definition, deliberative — not merely "related to the process by which policies are formulated," but constituting the process *itself*. *See Nat'l Council of La Raza*, 411 F.3d at 356. Here, the draft rules and guidance documents, the inter- and intra-agency comments and responses to such drafts, and the other documents created to assist EPA staff in developing formal agency policy were central to the

development of those formal rules and guidance documents — that is, paradigmatically part of the "deliberative process." *Fox News I*, 739 F. Supp. 2d at 549 (finding drafts of Department of Treasury guidelines and "a proposed interim final rule" to be covered by the deliberative process privilege); *New York Legal Assistance Grp., Inc. v. United States Dep't of Educ.*, No. 15-CV-3818 (LGS), 2017 WL 2973976, at *7 (S.D.N.Y. July 12, 2017) (same, regarding "draft guidance" drafted by the Department of Education and "an email chain discussing the draft guidance"). Accordingly, the forty-four records that the Court concludes fall within this category — which are listed in full in the Appendix to this Opinion and Order under the category "Drafts of agency rules, formal guidance, etc." — were properly withheld, and summary judgment is granted as to them.

### 3. Drafts of Agency Issue Papers, Reports, and Internal Guidance

For similar reasons, the Court concludes that seven records containing drafts of policy papers, reports, and internal agency guidance are protected by the deliberative process privilege. Three records are drafts of policy (or "white") papers regarding, for example, interim methods for evaluating pesticide assessments under the Endangered Species Act. *See* VI 113-114. Those three records are obviously predecisional with respect to the draft policies in question, and "reflect[] advisory opinions, recommendations and deliberations comprising part of a process" of crafting those policies, which did not represent the final views of the EPA and might "inaccurately reflect" the views of the agency if disclosed. *Grand Cent. P'ship*, 166 F.3d at 482 (internal quotation marks omitted); *see also Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 756 (S.D.N.Y. 2011), *amended on reconsideration* (Aug. 8, 2011) (approving the withholding of an issue paper that "discusse[d] a proposed change" in policy and "reflect[ed] comments and deletions" from other commenters).

Two others are draft responses by the EPA as part of inter- or intra-agency review —

specifically, in providing feedback on a Department of Commerce report with respect to

reducing regulatory burdens and in crafting an EPA report in response to an executive order

mandating evaluation of existing agency regulations.  *See* VI 120, 121.  The *Vaughn* index and

declarations adequately establish that these drafts were prepared by staff "to assist . . . agency

decisionmaker[s]" in formulating policy with respect to the EPA and Commerce policies on

regulatory burdens and regulation review, *see Hopkins*, 929 F.2d at 84 (internal quotation marks

omitted) — that is, were predecisional — and that the records represent the views and

recommendations of agency staff rather than an official agency policy— that is, were

deliberative.  *See Grand Cent. P'ship*, 166 F.3d at 482.

Finally, Documents 19359 and 21475[2] — which are draft internal guidelines for EPA

staff to be used in (1) evaluating companies' submissions for new chemicals and (2) developing

risk assessments for chemicals, *see* VI 80-81, 119-20 — were properly withheld by the EPA.

These records reflect "advisory opinions, recommendations and deliberations" about how the

agency should carry out specific aspects of its statutory mandate.  *Tigue*, 312 F.3d at 76 (internal

quotation marks omitted).  And "if released," they "would inaccurately reflect or prematurely

disclose the views of the agency," as the staff (and especially, in the case of the first record, the

outside contractor) who drafted them were "not the final decisionmaker."  *Brennan Ctr. for

Justice at New York Univ. Sch. of Law v. U.S. Dep't of Justice*, 697 F.3d 184, 202 (2d Cir. 2012)

(internal quotation marks omitted); *see also* VI 80-81 ("The draft document . . . was developed

by an EPA contractor and then circulated for internal discussion and review by EPA staff and

---

[2]      The *Vaughn* Index lists records using long alphanumeric strings.  For convenience, the
Court refers to records using only their unique terminal digits.  For example, "ED_001338_
00019359" becomes "Document 19359."

managers."); *id.* at 119-20 (draft risk assessment handbook "continues to be . . . in development").  Summary judgment is thus granted to the EPA as to these seven records.[3]

### 4.  "Messaging" Records

The next category of records at issue reflects internal deliberations by EPA staff about how the agency should communicate its policies to people outside the agency.  These records fall into three rough categories: (1) "talking points" for the Administrator and senior agency staff about various agency policies; (2) discussions about how to respond to inquiries from the press, along with draft responses; and (3) discussions about how to respond to questions and requests from members of Congress, along with draft responses.

The EPA claims these records are protected by the deliberative process privilege, although the precise claim of privilege is somewhat unclear and inconsistent.  For instance, the agency contends that "early drafts of . . . public statements" were withheld because EPA staff "were still developing the Agency's *policies* and public statements regarding those policies." ECF No. 37 ("EPA Mem."), at 19 (emphasis added); *see also* Myrick Decl. ¶ 35 ("The records at issue reflect [internal] discussions . . . at a time when EPA's policymaking processes . . . were still ongoing and had not been finalized.").  These statements indicate that disclosure of these "messaging" records would compromise the agency's deliberative processes about the substantive agency policies to which the messaging documents relate.  But in other submissions, particularly the *Vaughn* entries for each of these records and the EPA's reply memorandum, the agency appears to argue that the deliberative processes that necessitate shielding these records from public view surround the messaging decisions *themselves*, not the underlying substantive

---

[3]     The records are Documents 5211, 18740, and 26423 (VI 112, 113, 114); 15277 and 9731 (VI 120, 121); and 19359 and 21475 (VI 80, 119).

policymaking decisions. *See, e.g.*, ECF No. 46 ("EPA Reply"), at 5-6 (regarding the "talking

points" records, "[t]he relevant decisions are whether and how the agency should publicly

present and/or prepare for public debate or questioning about a *previously-decided policy*"

(emphasis added)); VI 65 (22782) ("The withheld information demonstrates the give-and-take

exchange of ideas and opinions that occurred in developing the Agency's response to the . . .

reporter's inquiry."). For its part, the NRDC argues that these records are not protected because

they are not predecisional — that is, they are "*post*-deliberative material" because they discuss

"how EPA should present actions the agency *already has taken*." NRDC Mem. 15-16 (emphasis

added).[4]

This Court has previously held "that 'messaging' communications *can* be protected by

the deliberative process privilege." *New York v. United States Dep't of Commerce*, No. 18-CV-

2921 (JMF), 2018 WL 4853891, at *2 (S.D.N.Y. Oct. 5, 2018) "After all," the Court explained,

"an agency's decisions about what and how to communicate with Congress, the press, or the

public can, in and of themselves, involve substantive policymaking (or at least substantive policy

refinement) of the type that Congress has delegated to the agency, and the purposes of the

privilege are served by protecting the deliberations leading to those decisions." *Id.*

"Additionally, even (otherwise unprotected) simple 'messaging' communications 'are properly

withheld if their release would reveal the status of internal deliberations' about other, substantive

decisions falling within the agency's statutory ambit." *Id.* at *2 n.2 (quoting *Fox News I*, 739 F.

Supp. 2d at 545). At the same time, "not all 'messaging' decisions are so intimately bound up

with an agency's central policy mission." *Id.* at *2. Thus, not "*all* deliberations over what to say

---

[4]     NRDC makes this argument only with respect to the "draft talking points," but as the
Court will explain, the argument applies to most, if not all, of the records in this category.

are protected by the privilege." *Id.* "The key inquiry" in determining whether a messaging document is protected by the deliberative process privilege "is whether the drafts or communications reflect deliberations about what 'message' should be delivered to the public about an *already-decided* policy decision, or whether the communications are of a nature that they would reveal the deliberative process underlying a *not-yet-finalized* policy decision." *Citizens Union of City of New York v. Attorney Gen. of New York*, 269 F. Supp. 3d 124, 164 (S.D.N.Y. 2017); *accord New York*, 2018 WL 4853891, at *2; *Fox News Network, LLC v. U.S. Dep't of Treasury*, 911 F. Supp. 2d 261, 276 (S.D.N.Y. 2012).

Applying those standards here, the Court concludes that the EPA has, with one exception, failed to demonstrate that the "messaging" records have been properly withheld under the deliberative process privilege.

### a. Talking Points

First, several of the records are described as "talking points" — for example, draft talking points about "how to present the EPA program for reviewing new chemicals under the Toxic Substances Control Act" and "how to respond to the potential questions on glyphosate" (a pesticide then under review by the EPA) "if it should come up during [a] press conference." VI 1, 65-66 (401, 22970). According to the agency, these documents concern "whether and how the agency should publicly present . . . *previously-decided* polic[ies]." EPA Reply 5-6 (emphasis added); *see also* VI 96-97 (23178), *and* Myrick Decl. ¶ 24 (draft speech "to present and discuss [a] final rule" that had been published several days earlier).[5] That acknowledgement is fatal to

---

[5] Three other records contain "talking points," but for two of them (Documents 17682 and 25605, VI 98, 118), the talking points are part of internal briefing materials, rather than public-facing messaging documents, and so are analyzed later with other records in that category. The third (Document 2177, VI 6) is clearly exempt from disclosure because the talking points concerned a proposed agency rule that at the time had not been finalized.

the EPA's position: "[B]ecause they merely 'reflect deliberations about what "message" should be delivered to the public about an *already-decided* policy decision' and, thus, their disclosure would not 'reveal the deliberative process underlying a *not-yet-finalized* policy decision,'" these records are not protected under Exemption 5. *New York*, 2018 WL 4853891, at *3 (quoting *Citizens Union*, 269 F. Supp. 3d at 164). Nor does the EPA give any indication that it was "was exercising its essential policymaking role in [making] those routine messaging decisions." *Id.* Accordingly, summary judgment is denied as to these three records.

### b. Draft Responses to Press Inquiries

Next, three of the records are email strings between EPA staff about how to respond to press inquiries — specifically, to questions about (1) "asbestos," (2) "an update on the TSCA New Chemicals program and clearing the backlog of EPA's review of PMNs," and (3) "the Science Advisory Panel's postponed meeting on glyphosate." VI 13, 15, 64 (7169, 8309, 22782). As with the draft talking points, the EPA's justification for withholding these records is primarily that, if disclosed, they would shed light on internal deliberative processes with respect to communicating the agency's policies — here, to the press. *See, e.g.*, VI 14 (7169) ("The withheld portions of the [July 2017] email string reflect pre-decisional deliberations . . . about responding to a request from a reporter about asbestos."); VI 16 (8309) ("The withheld information reflects the give-and-take process for discussing EPA's response to a reporter's inquiry."). That is, the EPA claims only that these records are predecisional with respect to the "messaging" decisions, not the underlying policy decisions that are being communicated. *See, e.g.*, Myrick Decl. ¶ 30 (policy to which the asbestos inquiry related was finalized one month before the asbestos-related emails were exchanged). As discussed above, however, deliberations about messaging decisions are generally not protected unless an agency is "exercising its

essential policymaking role in [making] those routine messaging decisions, or that [those messaging decisions] are of the type that Congress has (even impliedly) authorized [the agency] to make in the exercise of its statutory discretion." *New York*, 2018 WL 4853891, at *3. Here, the EPA makes no attempt to show that these seemingly routine responses to reporters — about an interview request to discuss asbestos or a postponed meeting, VI 16, 65 — are, in fact, exercises of the EPA's essential policymaking functions in and of themselves. *See New York*, 2018 4853891, at *3 (finding that "draft responses to the *Washington Post*" were not exempt from disclosure); *Fox News I*, 739 F. Supp. 2d at 548 (determining that a "Q&A" sheet to help agency staff answer press inquiries was "neither predecisional with respect to a substantive policy decision nor deliberative," but rather "gave . . . staff members guidelines for responding to questions about a decision already made"). Accordingly, summary judgment is denied as to these records.[6]

### c. Draft Responses to Congress

Finally, ten records withheld concern how the EPA should respond to questions or requests for documents from members of Congress. Representative records include:

- Draft responses to two "Questions for the Record ["QFRs"] from the [House Appropriations Committee] . . . about 'Rewriting Several Rules per Executive Orders,'" VI 17 (9765); *see also* VI 72 (25096) (draft responses to other QFRs);

---

[6]     It is worth emphasizing that the EPA does not contend — at least, not in any comprehensible way — that disclosure of these email threads "would reveal the deliberative process underlying a *not-yet-finalized* policy decision," *Citizens Union*, 269 F. Supp. 3d at 164, even though, for instance, the question about the postponed glyphosate meeting *did* relate to a not-yet-finalized policy decision: the ongoing "registration review" for that pesticide. *See* Myrick Decl. ¶¶ 27-28; VI 65 (22782) ("Release of the withheld information would have a chilling effect on the Agency's ability to have open and frank discussions . . . about *developing the Agency's response to press inquiries*." (emphasis added)).

- a string of emails "about EPA's response to Senator Tom Udall's June 29, 2017 letter to EPA regarding the chemical substance chlorpyrifos," VI 18-19 (11126);[7] and

- three versions of "a draft letter responding to Senator Udall's statements on TSCA implementation at an Environmental Law Institute event," VI 59-60 (21815, 18846, 18932).

Once again, the EPA argues that these records must be exempt from disclosure to protect the agency's deliberations regarding how to respond to Congress, not its deliberations regarding any of the underlying agency policies. *See, e.g.*, VI 17 (9765) ("Release of the withheld information would discourage open and frank discussions . . . about responding to congressional inquiries."); *id.* at 19 (11126) ("The withheld information reflects pre-decisional deliberations between EPA staff and managers *about how to respond* to Senator Udall's letter to EPA about chlorpyrifos." (emphasis added)). And once again, this argument fails to persuade the Court that the records are exempt from disclosure. With one exception, the EPA does not sufficiently demonstrate that these decisions on how to respond to congressional inquiry about agency policy (1) are actually exercises of the EPA's "essential policymaking role" in and of themselves, *see New York*, 2018 WL 4853891, at *3, or (2) would "reflect[] internal agency deliberation on matters of substantive policy prior to . . . public announcement of those decisions," *Fox News I*, 739 F. Supp. 2d at 546. Based on the *Vaughn* index, there is no basis to conclude, for example, that developing a response to one congresswoman's request for peer-reviewed science about chlorpyrifos "involve[d] substantive policymaking" or even "substantive policy refinement" regarding that pesticide, *New York*, 2018 WL 4853891, at *2, or that disclosure of such discussions would reveal the agency's deliberations about the ongoing registration review. *See* VI 61-62 (19639).

---

[7]     Other records in this category also relate to Congressional queries regarding chlorpyrifos. *See* VI 25 (13150), 28 (13257), 61 (19639), 68 (23588), 73 (25349).

The one exception is a "one-page draft response" to a senator's question for the record that "sought EPA analysis and recommendations that was presented to EPA as part of considering a petition to take action on chlorpyrifos." VI 68-69 (23588). On its face, this record contains intra-agency discussions that are both predecisional (with respect to the EPA's decision on the petition) and deliberative (the agency's "analysis and recommendations" regarding the petition). That those deliberations are embedded within other deliberations — namely, how to respond to a senator's request for such deliberative material — does not change the fact that disclosure of the document "would reveal the deliberative process underlying a *not-yet-finalized* policy decision." *Citizens Union*, 269 F. Supp. 3d at 164. Accordingly, summary judgment is granted as to this record; it is denied with respect to the other nine records in this category.[8]

## 5. Briefing Documents

Another significant category of records at issue is internal briefing materials. Broadly stated, these are records — including papers, presentations, graphs, and email threads — created to brief senior agency staff about various topics within the agency's purview.

### a. Pesticide Registration Review

First, the briefing documents relating to the registration reviews of glyphosate and chlorpyrifos were appropriately withheld by the agency. *See* Myrick Decl. ¶¶ 27-29. For example, Document 15910 is an email thread among managers and agency staff discussing "the status of certain pesticides matters, including chlorpyrifos" — which was undergoing review by the EPA at the time, *see id.* ¶¶ 27, 29 — and included the participants' "opinions and recommendations for future action," VI 55-56. Other records similarly included the opinions

---

[8]     Notwithstanding this conclusion, as discussed below, Documents 18846 and 18932 were properly withheld pursuant to Exemption 5 and the attorney-client privilege.

and advice of agency staff regarding future action on pesticides with ongoing reviews. *See, e.g.*, VI 3-4 (1743). These records and the others like it were "prepared in order to assist . . . agency decisionmaker[s] in arriving at [their] decision[s]" regarding the pesticide reviews, and thus predecisional; and they formed a link in a "specified consultative process" and "reflect[ed] advisory opinions, recommendations and deliberations comprising part of [the] process" for determining the outcome of the registration reviews, and thus deliberative. *See Grand Cent. P'ship*, 166 F.3d at 482. Summary judgment is therefore proper as to these records (Documents 1743, 14507, 15910, 18487, 26227, and 2460, *see* VI 3, 39, 55, 59, 77, 115).

### b. TSCA Framework Rules

Four of the briefing documents are records or emails created "to help [a senior EPA manager] understand the role of epidemiology data" in human health risk assessments; at the time the records were created, "the [office] was briefing the . . . manager on such issues." VI 45 (14935); *see also* VI 40-41 (14518, 14561, 25173). It is far from clear, however, that the records "relate[] to a specific decision facing the agency," *Tigue*, 312 F.3d at 80, or that they "formed an essential link in a specified consultative process," *Grand Cent. P'ship*, 166 F.3d at 482. The agency claims that the documents relate to its decisions about the Framework Rules, *see* Myrick Decl. ¶ 24, but nothing in the *Vaughn* index entries provides a basis for that connection, *see* VI 40-41, 45; *see also* EPA Reply 2-3 (stating, without more, that the records "are predecisional because they played a role in the ongoing development of two regulations"). Because the EPA has failed to carry its burden of demonstrating that these records are predecisional *or* deliberative, the Court cannot find them protected under Exemption 5.[9]

---

[9]     The same goes for Documents 5427, 25605, and 25606, which were created to help prepare the EPA Administrator for meetings with an industry group and with Congress. *See* VI 10-11, 110, 118; Myrick Decl. ¶¶ 24, 25, 32. The *Vaughn* Index entries for these records make

By contrast, the EPA has adequately demonstrated that two of the records relate to then-ongoing processes for developing the Framework Rules, the disclosure of which would have revealed the opinions and recommendations of agency staff before those processes had run their course. *See Fox News I*, 739 F. Supp. 2d at 549 (reiterating that drafts of final agency regulations, along with "any communications regarding their drafting and revision, [are] properly withheld under the deliberative process privilege"). These documents were properly withheld. *See* VI 57, 98 (16046, 17682). And although the specific decisionmaking process in question is not described in any detail, Document 7028 apparently contains deliberative material relating to an agency decision on a certain class of insecticides and is thus protected by Exemption 5. *See id.* at 117-18. Summary judgment is thus granted as to these three records.

## 6. New Chemicals Program

Next are numerous records relating to the EPA's "New Chemicals Program," which "helps manage the potential risk to human health and the environment from chemicals new to the marketplace." Myrick Decl. ¶ 25. Pursuant to the TSCA, a company wishing to bring a new chemical to market must submit the chemical for review by the EPA. *See id.*; 15 U.S.C. § 2604. During the relevant time period, the agency was (1) working to reduce a backlog of New Chemicals cases under review by the EPA and (2) attempting more generally to "develop[] strategies to be more transparent in how EPA makes decisions on new chemicals" and "support[] the continued improvement of the . . . program." Myrick Decl. ¶ 25. Pursuant to its Memorandum Opinion and Order of July 25, 2019, the Court reviewed a number of these

no effort to explain how these materials relate to the Framework Rules decisions (5427), the New Chemicals program (25606), or the evaluation of existing regulations (25605), and, by extension, what roles the records played in those decisions, if any. To the extent the EPA is arguing that these documents are protected as "messaging" decisions, the Court rejects the claim for substantially the reasons it rejected the other claims of privilege made on that basis.

documents *in camera*. Although that review was focused on the question of segregability —

discussed in more detail later — it also informed the Court's assessment of the EPA's privilege

claims.

   a.   **Statistics and Factual Information Related to the New Chemicals Webpage**

   Based on the *in camera* review, the Court concludes that many of the New Chemicals

records in question consist wholly or substantially of nonprivileged factual material. *See Grand*

*Cent. P'ship*, 166 F.3d at 482 ("The privilege does not . . . , as a general matter, cover 'purely

factual' material."); *accord New York*, 2018 WL 4853891, at *3. More specifically, the records

provide numerical breakdowns of cases under review; the status of those cases in the review

process; and the agency's historical and projected progress in eliminating the backlog. *See, e.g.*,

VI 2 (1350); 5-6 (2026, 2234). This material is not itself deliberative, as the EPA itself

implicitly acknowledges. *See* EPA Reply 9 ("Statistics and data bearing on the status of various

reviews were 'inextricably intertwined' with deliberations about how backlogs of such reviews

should be cleared, and how the program could be improved . . . ."); *see also, e.g.*, *Nat'l Cong. for*

*Puerto Rican Rights ex rel. Perez v. City of New York*, 194 F.R.D. 88, 94 (S.D.N.Y. 2000)

(finding that statistical information about street-level arrests was not deliberative). Nor is it

"inextricably intertwined" with protected deliberative material. For that claim to succeed,

disclosure of the information here would have to "compromise the confidentiality of deliberative

information that *is* entitled to protection," *Lead Indus. Ass'n*, 610 F.2d at 85 (internal quotation

marks omitted) (emphasis added), such that probing the factual information "would be the same

as probing the decision-making process itself," *Montrose Chem. Corp. of California v. Train*,

491 F.2d 63, 68 (D.C. Cir. 1974). Having reviewed the records, the Court cannot agree that the

statistical information about New Chemicals reviews is "inextricably intertwined" with

deliberative material about "*how* backlogs . . . should be cleared" or "*how* the program could be

improved," EPA Reply 9 (emphasis added), or that its disclosure would reveal anything at all

about the agency's decisionmaking on these fronts. The EPA's conclusory assertions to the

contrary — that, among other things, the records "reflect[] a give-and-take discussion on

potential actions geared towards improving the New Chemicals program" — are inaccurate or

unpersuasive. Accordingly, the statistical information is not exempt from disclosure.[10]

Applying that reasoning to other, similar records, the statistics, graphs, and tabular

material in Documents 15046 and 15111 — draft webpages about the New Chemicals program

— are not exempt from disclosure either. By contrast, the proposed language contained in those

records, which is predecisional and reflects the agency's deliberations about improving the

review process, was properly withheld. Along similar lines, the bullet-pointed statistics in

Documents 1350 and 18234 — emails about the backlog — are not protected by the privilege.

The discussions that follow, on the other hand, concern the agency's attempts to address the

backlog, and need not be disclosed.[11] Finally, Document 14496, an email thread summarizing

the content and layout of the draft webpage, is manifestly not exempt from disclosure. It is

absurd to suggest that this information — including, for example, a one-line email from Dr. Beck

asking, "How do we make numbers align?" on the home page — would reveal policy-oriented

deliberations. *See* VI 38 (14496); *see also Tigue*, 312 F.3d at 80 ("[T]he privilege does not

---

[10]     This applies to Documents 2026, 2234, 2354, and 2490 in full. As noted, the Court
discusses the EPA's segregability claims further below.

[11]     Documents 15472, 15854, 24116, and 14467, which the Court did not review *in camera*,
appear to be similar to the records just discussed. Absent a basis to distinguish them, therefore,
the Court's ruling would apply to them as well. Further, to the extent that withheld portions of
Document 14125 (an internal draft weekly report) contain segregable, factual information about
"the status of chemical determinations and important deadlines," VI 35, the EPA should
reevaluate its privilege assertion in light of this Opinion and Order.

protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." (internal quotation marks omitted)).

### b. Other documents

The EPA has also failed to demonstrate that the two New Chemicals meeting agendas (Documents 2025 and 2353) are exempt from disclosure. While arguably predecisional, the agency has not shown that the agendas are deliberative material — that is, that they "form[] an essential link in a specified consultative process" relating to improving the New Chemicals Program. *Grand Cent. P'ship*, 166 F.3d at 482; *see MacNamara v. City of New York*, 249 F.R.D. 70, 81 (S.D.N.Y. 2008) (finding that meeting agendas that disclose only "broadly-defined issues discussed at . . . meetings" were not deliberative); *In re MTBE Prods. Liab. Litig.*, 898 F. Supp. 2d 584, 591 (S.D.N.Y. 2012) ("[M]eeting agendas . . . are not protected by the deliberative process privilege, as they only list topics to be discussed at a future time. Agendas are not themselves deliberative documents."). For substantially the same reasons, summary judgment is denied as to Document 2048, a draft agenda for a "Chemical Data Reporting (CDR) Inorganic Byproducts meeting." *See* VI 86.

Document 15213 (VI 50) — consisting of emails by senior managers "responding to the Chief of Staff's question regarding issues being addressed in the New Chemicals program," and including "recommendations and opinions" about those issues, VI 50 — is insufficiently described to compel a "logical and plausible" conclusion that the emails relate to a specific New Chemicals decisionmaking process or that they played a role in those decisions. *Wilner*, 592 F.3d at 73. Without knowing what the "issues" were, how they related to the EPA's process for improving the New Chemicals program, and what role the emails played in that process, summary judgment is not appropriate. *See, e.g.*, *Grand Cent. P'ship*, 166 F.3d at 483 (holding

that emails "directly related to . . . three agency decisions" and containing "information [that] . . . formed an important, if not essential, in [an agency's] consultative process" were predecisional and deliberative).  For substantially similar reasons, Document 12641 (VI 23) is also not exempt.

By contrast, Document 2233 — material that provided a senior manager with recommendations and proposals on "how to improve the New Chemicals program," VI 7-8 — is exempt.  Contrary to the NRDC's suggestion, the agency's initiative to improve the New Chemicals program, while somewhat hazily described, is a specific decisionmaking process rather than a "routine and ongoing process of agency self-evaluation." *Tigue*, 312 F.3d at 80 (internal quotation marks omitted); *see, e.g.*, Myrick Decl. ¶ 25 (describing the agency's attempts to improve the program).  Document 2233 reflects options, recommendations, and proposals — that is, paradigmatic deliberative material — for senior leaders to consider in connection with that initiative.  Document 7657 is a closer call, but also exempt; the *Vaughn* index indicates that the agency was considering certain chemical registration review actions (making it predecisional) and discussing the effects of those proposed policies on one specific company, as an exemplar, whose products were affected by such actions (making it deliberative).

### 7.  **Miscellaneous Records**

That leaves a handful of records, which the Court will address in summary fashion.  First, the Court concludes that the following records are exempt:

- Document 6842 (VI 12-13).  A draft document setting out components of the EPA's Strategic Plan for fiscal years 2018-22 is clearly predecisional with respect to the strategic planning process, and the EPA has logically and plausibly demonstrated that the record was deliberative, as it was created to assist senior managers in "determining what should be included in [one office's] contributions to the . . .  strategic plan." *Id.* at 13.

- Document 9370 (VI 111).  The determination of proposed milestones for executing the agency's statutorily prescribed review of chlorpyrifos is not a "routine operating decision[]" or a merely "process-oriented" discussion, NRDC Mem. 15, but deliberation

over carrying out a substantive policymaking responsibility committed to the agency by statute.

By contrast, the Court concludes that the following records are *not* protected by the privilege:

- Document 23777 (VI 69). Nothing in the *Vaughn* index indicates that the emails here, which concern "the status of the [proposed rule] in the regulatory development process" and "the process for OMB's review," VI 70, are deliberative rather than simply logistical or operational. *See, e.g.*, *E.B. v. New York City Bd. of Educ.*, 233 F.R.D. 289, 293 (E.D.N.Y. 2005) (observing that discussions about "database management" and other "logistical issues" are "not the type of policy oriented judgment the deliberative process privilege is designed to protect," and collecting cases).

- Document 8777 (VI 122). The EPA's vague assertions regarding this record — that it "provides a list of ongoing issues" and "the status of the issues and any potential timelines" — fail to explain how it relates to the pesticide reviews or what role it played in actual deliberations regarding those decisionmaking processes. *See Grand Cent. P'ship*, 166 F.3d at 482; Myrick Decl. ¶ 27.

The Appendix to this Opinion and Order provides a comprehensive list of the records at issue and whether they were properly withheld on account of the deliberative process privilege.

## D. Information Withheld Under the Attorney-Client Privilege

Moving beyond the deliberative process privilege, the EPA has withheld thirteen records (also pursuant to Exemption 5) based on the attorney-client privilege. *See* Myrick Decl. ¶¶ 13, 36. Of those, nine (Documents 12385, 12489, 13607, 12661, 14737, 24243, 13626, 14947, and 14626) were properly withheld under the deliberative process privilege as drafts of agency rules, formal guidance, or scoping documents, *see* Appendix, so the Court need not determine whether they were also properly withheld as attorney-client privileged material. Of the other four, two (Documents 6783 and 11031) were withheld on the basis of attorney-client privilege alone, while two (18846 and 18932) were also withheld under the deliberative process privilege, a claim of privilege that the Court rejected. Accordingly, the Court will address those four documents.

The attorney-client privilege is "one of the oldest recognized privileges for confidential communications," and "promote[s] broader public interests in the observance of law and the

administration of justice." *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (internal

quotation marks omitted). "The privilege . . . serve[s] both to protect the attorney-client

relationship and to permit attorneys to carry out their duties fully." *In re Gen. Motors LLC

Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 7574460, at *3 (S.D.N.Y. Nov. 25,

2015). The party invoking the attorney-client privilege — here, the EPA — "must show (1) a

communication between client and counsel that (2) was intended to be and was in fact kept

confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re

Cty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007); *accord In re Gen. Motors LLC Ignition Switch

Litig.*, 80 F. Supp. 3d 521, 526 (S.D.N.Y. 2015). In general, the privilege protects

communications between a government attorney and her client to the same extent it would

protect those of an attorney and private party in civil litigation. *See Cty. of Erie*, 473 F.3d at 419;

*In re Grand Jury Investigation*, 399 F.3d 527, 534-35 (2d Cir. 2005). In all cases, however,

"courts apply the privilege only where necessary to achieve its purpose and construe the

privilege narrowly because it renders relevant information undiscoverable." *United States v.

Krug*, 868 F.3d 82, 86 (2d Cir. 2017) (internal quotation marks omitted).

Applying those standards here, all four records — Documents 6783, 18846, 18932, and

11031 — were properly withheld by the EPA. Document 6783 is an email from an EPA attorney

to OCSPP, his client; was intended to be and was kept confidential; and was made "for the

purpose of . . . providing legal advice" on a "matter for which the client has sought professional

advice" — here, the implications, for other matters before the agency, of a recent court decision

about mandamus relief as to a pesticide action. *See* VI 11-12. Likewise, Documents 18846 and

18932 were letter drafts reviewed and edited by Office of General Counsel attorneys for their

OCSPP clients; were kept confidential; and reviewed and commented upon a "TSCA legal

matter within the draft letter for which the client has sought legal review and recommendation."

*Id.* at 60-61.  Contrary to the NRDC's assertion, EPA attorneys did not merely review the letters,

*see* NRDC Mem. 19-20; they also "provided recommendations pertaining to legal issues in the

draft letter."  VI 61.  Accordingly, the attorneys' drafts were "made for the purpose of . . .

providing legal advice."  *Cty. of Erie*, 473 F.3d at 419.  And finally, Document 11031 — a "draft

agenda" for a meeting between OCSPP and the Office of General Counsel — is protected

because it includes "identified legal matters" relating to OCSPP's policymaking function and

within the attorney-client relationship, including legal matters relating to chlorpyrifos and the

TSCA Framework Rules.  VI 18; *see, e.g.*, *AIU Ins. Co. v. TIG Ins. Co.*, No. 07-CV-7052 (SHS)

(HBP), 2009 WL 1953039, at *6 (S.D.N.Y. July 8, 2009) (finding privileged a meeting agenda

that "indicate[d] the focus of an attorney-client conversation related to the legal representation in

th[e] case"); *cf. Diversified Grp., Inc. v. Daugerdas*, 304 F. Supp. 2d 507, 514 (S.D.N.Y. 2003)

(distinguishing between documents that indicate "the general purpose of the work performed,"

and are not privileged, and those that "reveal . . . the specific nature of the services provided,"

which are).  Accordingly, the EPA's motion is granted as to all four of those documents.[12]

---

[12]        The parties dispute whether a communication from an attorney to a client is privileged to
the same extent as a communication from a client to an attorney, or only to the extent that an
attorney communication would reveal confidential facts communicated by the client.  *Compare*
NRDC Mem. 18-19, *with* EPA Reply 11.  The issue appears to be somewhat unsettled in the
Second Circuit.  *Compare ACLU v. Dep't of Def.*, No. 15-CV-9317 (AKH), 2017 WL 4326524,
at *4 & n.3 (S.D.N.Y. Sept. 27, 2017) (observing that "in the Second Circuit, legal advice
divorced from confidential facts supplied by a client *probably* is not protected by the attorney-
client privilege," and collecting authorities (emphasis added)), *and United States v. Silverman*,
430 F.2d 106, 122 (2d Cir. 1970), *with Cty. of Erie*, 473 F.3d at 421-23 (discussing the
applicability of the privilege to advice from government lawyers without reference to any
confidential-facts limitation).  But the Court need not and does not resolve that dispute here.
Only one of the records is even arguably not based on confidential client facts — Document
11031 — and the Court is satisfied that the EPA has made a "logical and plausible" showing that
the draft meeting agenda, which discusses "ongoing" and "identified" legal issues, is based in
some measure on confidential information from OCSPP.  *See Wilner*, 592 F.3d at 75; VI 18.

**E. The Disclosure of Reasonably Segregable, Non-Privileged Material**

Last but not least, the NRDC contends that the EPA failed to disclose reasonably segregable, non-privileged material. An agency is obligated to disclose any reasonably segregable, non-privileged material, including — as already discussed at some length — "purely factual" material. *Grand Cent. P'ship*, 166 F.3d at 482; *see also* 5 U.S.C. § 552(b). In its earlier order, the Court directed the EPA to submit a sample of records for *ex parte*, *in camera* inspection to aid the Court's determination of "whether their factual and privileged contents are . . . 'inextricably intertwined.'" *Hopkins*, 929 F.2d at 85-86. That order was prompted by (1) the agency's sweeping, conclusory assertion that it had conducted a segregability analysis and its declaration that any non-disclosed factual material was "inextricably intertwined" with privileged material and (2) the NRDC's colorable argument that at least some segregable factual material was improperly withheld. *See* Myrick Decl. ¶ 43; ECF No. 53, at 3-4.

As discussed above, upon review of the ten records *in camera*, the Court concludes that five were not exempt from disclosure at all; four contained some segregable factual information that should have been disclosed; and one was properly withheld in its entirety. Based on that sample — admittedly, perhaps an unrepresentative one, *see* ECF No. 53, at 4 — the Court is not persuaded by the EPA's across-the-board claims that it has appropriately disclosed all of the reasonably segregable, non-exempt material from its records. It follows that judgment cannot be granted in the EPA's favor on the issue. *See, e.g.*, *Hopkins*, 929 F.2d at 85-86 (reversing a district court's grant of summary judgment where the agency "only asserted in a conclusory fashion that any factual observations contained in the reports [were] 'inextricably intertwined' with . . . privileged opinions and recommendations"); *El Badrawi v. Dep't of Homeland Sec.*, 583 F. Supp. 2d 285, 316 (D. Conn. 2008) (finding summary judgment inappropriate where the

court could not "determine the propriety of [the agency's] segregability determinations" because its *Vaughn* index lacked sufficient detail); *Ferrigno v. U.S. Dep't of Homeland Sec.*, No. 09-CV-5878 (RJS), 2011 WL 1345168, at *11 (S.D.N.Y. Mar. 29, 2011) (Sullivan, J.) (granting summary judgment "on all issues except segregability" and ordering submission of the records for *in camera* review).

## CONCLUSION

To summarize the Court's many conclusions: The EPA's search for responsive records was adequate, and it has established that it withheld information only where it reasonably foresaw that disclosure would "harm an interest protected by" Exemption 5. Beyond that, the agency justified its withholdings pursuant to Exemption 5 and the attorney-client privilege, and justified the non-disclosure of those records listed in the Appendix pursuant to Exemption 5 and the deliberative process privilege. Summary judgment is **GRANTED** to the EPA on those issues and as to those records. By contrast, and as described throughout this Opinion, the agency failed to justify its decision not to disclose the remaining records. For those records, summary judgment is **DENIED**. As to the documents reviewed by the Court *in camera* and found to include segregable, non-privileged factual material, which are also listed in the Appendix, the EPA shall promptly produce the records or the segregable, non-exempt portions thereof to the NRDC.[13] Finally, summary judgment is **DENIED** on the agency's segregability claims.

---

[13]     Although NRDC did not cross-move for summary judgment, ordering production of these records is nevertheless appropriate. Because the Court reviewed them *in camera*, it is able to definitively state that the factual material within them is (1) not protected by the deliberative process privilege and (2) segregable from any material that is privileged. *See* 5 U.S.C. § 552(a)(4)(B) (on *de novo* review and "[o]n complaint, the district court . . . has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant); *see also, e.g.*, *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 524 (2d Cir. 2018) (noting that, while "notice-free, sua sponte entry of summary judgment is" discouraged, it may be granted "when there is no

That raises the question of next steps. On that front, one question looms large: Whether the NRDC agreed to limit any relief to the 120 documents as to which the EPA agreed to provide a *Vaughn* index or, put differently, whether it abandoned its requests for disclosure of the 950-some odd responsive records that the *Vaughn* index does not address. The EPA contends that the NRDC agreed to abandon its claims as to all records beyond those included in the *Vaughn* index. *See* EPA Mem. 1 & n.1 (describing "the remaining 116 records . . . subject to challenge in this case" and asking for summary judgment "with respect to all claims asserted in this action"); EPA Reply 1 n.1. The NRDC strenuously objects. *See* NRDC Mem. 5-6; NRDC Surreply 6-8. Upon review of the parties' emails, *see* ECF No. 48-1, at 1-2, the Court concludes that the NRDC has the better of the argument, substantially for the reasons stated in its memoranda of law. In brief, the EPA offered the NRDC two options, the latter of which provided that the agency would provide a *Vaughn* index for 120 records selected by the NRDC "with the express understanding that the 120 records comprise all of the documents that NRDC is most interested in and seeks to challenge on summary judgment." *Id.* at 2. But the NRDC made a counterproposal that conspicuously deleted that "express understanding," *see id.* at 1, compelling the conclusion that the NRDC did *not* agree, let alone clearly agree, to limit its challenge to those documents alone. Accordingly, the Court agrees with the NRDC that it has not waived or abandoned its claims as to the other, as-yet-unaddressed records and that the non-disclosure of those records remains at issue.

In light of this Opinion and Order and the claims that remain, the parties shall meet and confer to discuss (1) how the litigation should proceed from here and (2) how this Opinion and

_____

indication that the party against whom summary judgment would be entered could present evidence that would affect the summary judgment determination" (italics omitted)).

Order applies to the records not addressed by the *Vaughn* index. **No later than September 20, 2019**, the parties shall file letter-briefs, not to exceed four single-spaced pages, stating their views on those issues — mindful of the Court's desire to minimize further proceedings and the scope of any further judicial review.[14] That is, the Court hopes to find a way to resolve the remaining claims in a single stroke and without the need for review of more than a very small sample of the records at issue. Finally, the parties shall appear for a conference before the Court on **October 3, 2019**, at **4:30 p.m.** to discuss their views on how to proceed.

The Clerk of Court is directed to terminate Docket No. 35.

SO ORDERED.

Dated: August 30, 2019
New York, New York

JESSE M. FURMAN
United States District Judge

---

[14] The parties should also meet and confer about the forty-four documents the Court has categorized as drafts of agency rules, formal guidance, and scoping documents, *see supra* Section C.2, and advise the Court in their letters if they believe any of the records do not properly belong in this category.

| Document | *Vaughn* | Category | Exempt? |
|---|---|---|---|
| ED_001338_00012489 | 22 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00013626 | 32 | Drafts of agency rules, formal guidance, etc. | YES |
| Document File 27 | 89 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00012661 | 93 | Drafts of agency rules, formal guidance, etc. | YES |
| Document File 37 | 97 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00013223 | 100 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00002177 | 6 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00011801 | 19 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00012385 | 21 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00013188 | 26 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00013283 | 29 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00013607 | 30 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00013660 | 33 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00014763 | 42 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00014822 | 43 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00015448 | 44 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00015038 | 46 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00015120 | 48 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00015339 | 51 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00015879 | 54 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00016774 | 54 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00024303 | 70 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00025624 | 74 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00025793 | 76 | Drafts of agency rules, formal guidance, etc. | YES |
| Document File 6 | 81 | Drafts of agency rules, formal guidance, etc. | YES |
| Document File 14 | 82 | Drafts of agency rules, formal guidance, etc. | YES |
| Document File 38 | 83 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00016105 | 84 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00016107 | 85 | Drafts of agency rules, formal guidance, etc. | YES |

| | | | |
|---|---|---|---|
| Document File 9 | 88 | Drafts of agency rules, formal guidance, etc. | YES |
| Document File 25 | 90 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00010159 | 92 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00015083 | 94 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00016981 | 95 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00011721 | 99 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00025501 | 101 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00014483 | 102 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00014737 | 104 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00024243 | 105 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00014947 | 106 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00014626 | 107 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00012315 | 109 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00018994 | 87 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00015260 | 116 | Drafts of agency rules, formal guidance, etc. | YES |
| ED_001338_00005211 | 112 | Drafts of agency issue papers, reports, etc. | YES |
| ED_001338_00018740 | 113 | Drafts of agency issue papers, reports, etc. | YES |
| ED_001338_00026423 | 114 | Drafts of agency issue papers, reports, etc. | YES |
| ED_001338_00015277 | 120 | Drafts of agency issue papers, reports, etc. | YES |
| ED_001338_00009731 | 121 | Drafts of agency issue papers, reports, etc. | YES |
| ED_001338_00019359 | 80 | Drafts of agency issue papers, reports, etc. | YES |
| ED_001338_00021475 | 119 | Drafts of agency issue papers, reports, etc. | YES |
| ED_001338_00000401 | 1 | Messaging (talking points) | NO |
| ED_001338_00022970 | 65 | Messaging (talking points) | NO |
| ED_001338_00023178 | 96 | Messaging (talking points) | NO |
| ED_001338_00007169 | 13 | Messaging (draft responses to press) | NO |
| ED_001338_00008309 | 15 | Messaging (draft responses to press) | NO |
| ED_001338_00022782 | 64 | Messaging (draft responses to press) | NO |
| ED_001338_00009765 | 17 | Messaging (draft responses to Congress) | NO |
| ED_001338_00025096 | 72 | Messaging (draft responses to Congress) | NO |

APPENDIX

| | | | |
|---|---|---|---|
| ED_001338_00011126 | 18 | Messaging (draft responses to Congress) | NO |
| ED_001338_00013150 | 25 | Messaging (draft responses to Congress) | NO |
| ED_001338_00019639 | 61 | Messaging (draft responses to Congress) | NO |
| ED_001338_00025349 | 73 | Messaging (draft responses to Congress) | NO |
| ED_001338_00013257 | 28 | Messaging (draft responses to Congress) | NO |
| ED_001338_00021815 | 59 | Messaging (draft responses to Congress) | NO |
| ED_001338_00023588 | 68 | Messaging (draft responses to Congress) | YES |
| ED_001338_00001743 | 3 | Briefing (pesticide review) | YES |
| ED_001338_00014507 | 39 | Briefing (pesticide review) | YES |
| ED_001338_00015910 | 55 | Briefing (pesticide review) | YES |
| ED_001338_00018487 | 59 | Briefing (pesticide review) | YES |
| ED_001338_00026227 | 77 | Briefing (pesticide review) | YES |
| ED_001338_00002460 | 115 | Briefing (pesticide review) | YES |
| ED_001338_00014935 | 45 | Briefing (TSCA Framework Rules) | NO |
| ED_001338_00014518 | 40 | Briefing (TSCA Framework Rules) | NO |
| ED_001338_00014561 | 40 | Briefing (TSCA Framework Rules) | NO |
| ED_001338_00025173 | 41 | Briefing (TSCA Framework Rules) | NO |
| ED_001338_00016046 | 56 | Briefing (TSCA Framework Rules) | YES |
| ED_001338_00017682 | 98 | Briefing (TSCA Framework Rules) | YES |
| ED_001338_00007028 | 117 | Briefing (TSCA Framework Rules) | YES |
| ED_001338_00005427 | 10 | Briefing (TSCA Framework Rules) | NO |
| ED_001338_00025605 | 118 | Briefing (New Chemicals) | NO |
| ED_001338_00025606 | 110 | Briefing (existing regulations) | NO |
| ED_001338_00001350 | 2 | New Chemicals program | PARTLY |
| ED_001338_00002026 | 5 | New Chemicals program | NO |
| ED_001338_00002234 | 5 | New Chemicals program | NO |
| ED_001338_00002354 | 79 | New Chemicals program | NO |
| ED_001338_00002490 | 9 | New Chemicals program | NO |
| ED_001338_00015046 | 47 | New Chemicals program | PARTLY |
| ED_001338_00015111 | 47 | New Chemicals program | PARTLY |

# APPENDIX

| | | | |
|---|---|---|---|
| ED_001338_00018234 | 58 | New Chemicals program | PARTLY |
| ED_001338_00015472 | 52 | New Chemicals program | * |
| ED_001338_00015854 | 53 | New Chemicals program | * |
| ED_001338_00024116 | 36 | New Chemicals program | * |
| ED_001338_00014467 | 36 | New Chemicals program | * |
| ED_001338_00014125 | 35 | New Chemicals program | * |
| ED_001338_00014496 | 38 | New Chemicals program | NO |
| ED_001338_00002025 | 4 | New Chemicals program | NO |
| ED_001338_00002353 | 8 | New Chemicals program | NO |
| ED_001338_00002048 | 86 | Chemical Data Reporting rule | NO |
| ED_001338_00015213 | 50 | New Chemicals program | NO |
| ED_001338_00012641 | 23 | New Chemicals program | NO |
| ED_001338_00002233 | 7 | New Chemicals program | YES |
| ED_001338_00007657 | 14 | New Chemicals program | YES |
| ED_001338_00006842 | 12 | Miscellaneous | YES |
| ED_001338_00009370 | 111 | Miscellaneous | YES |
| ED_001338_00023777 | 69 | Miscellaneous | NO |
| ED_001338_00008777 | 122 | Miscellaneous | NO |
| ED_001338_00006783 | 11 | Attorney-client privilege | YES |
| ED_001338_00018846 | 60 | Attorney-client privilege | YES |
| ED_001338_00018932 | 60 | Attorney-client privilege | YES |
| ED_001338_00011031 | 18 | Attorney-client privilege | YES |
| ED_001338_00023303 | 67 | Privacy (not challenged) | YES |
| ED_001338_00021669 | 62 | Privacy (not challenged) | YES |
| ED_001338_00022457 | 63 | Privacy (not challenged) | YES |
| ED_001338_00023152 | 66 | Privacy (not challenged) | YES |
| ED_001338_00026735 | 78 | Privacy (not challenged) | YES |

**NOTES**

Documents marked with an asterisk should be reevaluated in light of the Court's Opinion and Order, as discussed above.